UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| RICKY JESTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:18-cv-00131-JPH-MJD |
| | ) | |
| DR. CARL KUENZLI MD., RMD, | ) | |
| DR. MICHAEL MITCHEFF MD., RMD, | ) | |
| DR. PEARCY DDS., RDD, | ) | |
| DR. SAMUAL BYRD MD., | ) | |
| DR. JIMERSON DDS., | ) | |
| NURSE KIM HOBSON RN., HSA, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| INDIANA DEPARTMENT OF CORRECTION, | ) | |
| | ) | |
| Interested Party. | ) | |

**ENTRY GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

For the reasons explained in this Entry, the defendants' motion for summary judgment, dkt.

[119], is **granted in part and denied in part.**

## I. Background

Plaintiff Ricky Jester, at all relevant times a prisoner confined at the Wabash Valley

Correctional Facility (Wabash Valley), brought this 42 U.S.C. § 1983 civil rights action alleging

that defendants were deliberately indifferent to serious medical needs relating to gastric reflux and

his teeth. There are six remaining defendants: Samuel Byrd M.D., Carl Kuenzli, M.D., Kimberly

Hobson, Ruthie Jimerson, D.D.S., Jeffrey Pearcy, D.D.S., and Dr. Michael Mitcheff, Dkt. 2; dkt.

7. Mr. Jester has five claims:

1.      Dr. Pearcy and Dr. Jimerson failed to timely extract Mr. Jester's rotten teeth

1

and order dentures in a timely manner.

2. Dr. Jimerson delayed Mr. Jester's access to dentures for four years and as a result Mr. Jester only had eight teeth that continue to decay and cause extreme pain.

3. Regional medical directors Dr. Mitcheff and Dr. Kuenzli denied Mr. Jester proper medical treatment for his "reflux and regurgitation." As a result, Mr. Jester has experienced pain, suffering, and the deterioration and loss of teeth.

4. Dr. Byrd refused to follow a specialist's orders for a soft, bland diet and Prilosec 40 mg.

5. Health services administrator Nurse Kim Hobson was "directly involved with" the regional medical directors, Dr. Byrd, and Dr. Jimerson in denying Mr. Jester proper treatment for his serious medical needs.

Dkt. 7 at 2 (screening Entry).

Mr. Jester seeks injunctive relief in the form of a mechanical soft bland diet, Prilosec 40 mg, and dentures, and compensatory and punitive damages. Dkt. 2.

The defendants seek summary judgment. Dkt. [119]. Mr. Jester responded, dkt. [149], the defendants replied, dkt. [156], and Mr. Jester surreplied, dkt. [162]. The motion is ripe for resolution.

For purposes of this Entry, the claims are divided into two categories: claims against Dr. Jimerson and Dr. Pearcy relating to dental needs, and claims against Dr. Mitcheff, Dr. Kuenzli, Dr. Byrd, and Nurse Hobson relating to acid reflux and special diet.

## II.  Summary Judgment Standard

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that might affect the outcome of the suit under applicable substantive law." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (internal quotation omitted). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury

2

could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The Court views the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor. *Barbera v. Pearson Educ., Inc.,* 906 F.3d 621, 628 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

## III. Discussion

### A.    Preliminary Ruling on Certain Evidence

Mr. Jester argues that Dr. Jimerson was not a qualified dentist and should not have been allowed to practice dentistry at Wabash Valley. Dkt. 149 at 2-6, 25-30. He has presented evidence of Dr. Jimerson's placement on probation in 2008 by the Michigan Board of Dentistry, dkt. 147-4 at 6-11, as well as of Dr. Jimerson's license being placed on indefinite probation by the Indiana Board of Dentistry in 2013 and being subject to reinstatement, *id*. at 50-56. He has also filed affidavits from ten other inmates complaining about allegedly substandard and painful dental treatment performed by Dr. Jimerson between 2010 and 2015. *Id.* at 71-86.  Similarly, Mr. Jester has submitted documents relating to an arrest of Dr. Byrd and the loss of his privilege to prescribe controlled substances. Dkt. 147-3 at 24-26.  Dr. Jimerson and Dr. Byrd object to all this evidence as immaterial and as barred by Federal Rule of Evidence 404(b) (Crimes, Wrongs, or Other Acts).

"Rule 404(b) excludes relevant evidence of other crimes, wrongs, or acts if the purpose is to show a person's propensity to behave in a certain way . . . ." *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir. 2014). The evidence identified by Mr. Jester relating to Dr. Jimerson's professional licensure and disciplinary issues and Dr. Byrd's arrest is not permissible to prove that

Dr. Jimerson and Dr. Byrd were deliberately indifferent to Mr. Jester's medical needs. "Other acts" evidence is not admissible under Rule 404(b) unless it is used to establish "a matter in issue other than the defendant's propensity to commit like conduct" and "the probative value of the evidence must not be outweighed by the danger of unfair prejudice." *Okai v. Verfuth,* 275 F.3d 606, 610-11 (7th Cir. 2011); *see also Dodd v. Syed,* 2020 WL 5517349 (W.D. Wis. Sept. 14, 2020) (if inmate's proposed evidence of other inmates' complaints and lawsuits filed against defendant physician is offered to prove physician has a propensity to mistreat prisoners, that is precisely the type of evidence Rule 404 prohibits). Here, Mr. Jester has not explained how the "other acts" evidence is relevant to a determination of whether defendants knew about Mr. Jester's condition and the substantial risk of harm it posed but disregarded that risk.  Mr. Jester's desire to prove deliberate indifference on the part of the medical providers based on past alleged "bad acts" is barred by Rule 404(b).

In addition, the Court disagrees with Mr. Jester's contention that the evidence shows a habit or routine practice under Rule 406. This is because, as discussed in this Entry, Mr. Jester has failed to designate evidence demonstrating that it was "semi-automatic" for either defendant to act with deliberate indifference. *See Nelson v. City of Chicago,* 810 F.3d 1061, 1073 (7th Cir. 2016) ("[B]efore a court may admit evidence of habit, the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-automatic' in nature.") (internal quotation omitted).

This evidence will be disregarded for purposes of the motion for summary judgment. In addition, to the extent Mr. Jester argues that Corizon, LLC (Corizon) and Wexford of Indiana, LLC (Wexford) were deliberately indifferent for hiring providers who have a history of complaints

and criminal charges, such claims were not alleged in the complaint and those entities are no longer parties in this action. Dkt. 7. Therefore, there is no claim at issue against Corizon or Wexford.

### B.     Claims Relating to Dental Needs

Mr. Jester alleges that Dr. Pearcy, DDS, and Dr. Jimerson, DDS, failed to extract Mr. Jester's rotten teeth and order dentures in a timely manner. More specifically, Dr. Jimerson allegedly delayed Mr. Jester's access to dentures for four years and as a result Mr. Jester only had eight teeth that continued to decay and cause extreme pain.

### 1.     Undisputed Facts

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Jester as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Dr. Jimerson is a dentist licensed to practice in the state of Indiana. Dkt. 121-1, ¶ 2. She was Mr. Jester's primary dentist from June 2012 through April 9, 2018. *Id.,* ¶ 7.

Dr. Pearcy is a dentist licensed to practice dentistry in the state of Indiana. Dkt. 121-4, ¶ 2. From April 5, 2010, through March 31, 2017, he was employed as the Regional Dental Director for Corizon. *Id.,* ¶ 3. Since April 1, 2017, Dr. Pearcy has been employed as a dentist and Dental Services Director by Wexford. His roles at Corizon and Wexford are the same. *Id.* Dr. Pearcy's duties as the Dental Services Director are mostly administrative. *Id.,* ¶ 4. As the Dental Services Director, Dr. Pearcy ensures that dental services are provided to Indiana offenders in accordance with Indiana Department of Correction (IDOC) policy, he staffs the facilities with licensed dentists and dental assistants, and he manages the dental prosthetic prior approval (PPA) process. *Id.*

Otherwise, the site dentists determine the course of treatment for each patient. *Id.* Dr. Pearcy never personally examined or treated Mr. Jester, but he has been consulted by Mr. Jester's dentists and has approved dental prostheses for him. *Id.*, ¶ 7.

The IDOC Healthcare Services Directives (HCSDs) and Dental Services Manual were established by the IDOC with input from dental services. Dkt. 121-4, ¶ 5; dkt. 121-3. These policies are compliant with national standards for correctional facilities and meet the standard of care for dentistry. Dkt. 121-4, ¶ 5. IDOC policy provides for removable dental prostheses (*e.g.*, dentures) for those offenders who qualify. *Id.*, ¶ 6. Dentures can be made for the entire mouth (*i.e.*, full denture) or part of the mouth (*i.e.*, partial denture). *Id.* A full denture typically is provided when a patient is missing all his natural teeth. *Id.*

A partial denture is typically provided to a patient who is missing one or many of his natural teeth. *Id.* Pursuant to IDOC policy, a patient qualifies for a partial denture under the following conditions:

> a.   exhibits adequate oral hygiene practices;
>
> b.   presence of bone and supporting teeth capable of accommodating a partial denture without significant surgical intervention;
>
> c.   application of the two (2) point rule—if two (2) posterior teeth are in contact on each side of the jaw, a partial denture will not be provided unless all anterior teeth are missing; and
>
> d.   the dental provider believes the prosthesis will be functional and last for six (6) years or more.

*Id.*

Dental prostheses are durable and are expected to last several years under normal wear-and-tear conditions. *Id.* Therefore, under IDOC policy, offenders are responsible for all costs associated with repair or replacement of the prostheses for a period of six (6) years, unless damage

to the prosthesis was caused by dental staff or there is a change in the shape of the jaw that renders the prosthesis unusable. *Id.* All dental prostheses require pre-approval by the Dental Services Director. *Id.* This approval process ensures that dental prostheses are both clinically indicated and in compliance with IDOC policy. *Id.* The dental prosthetic prior approval process is similar to any other utilization management review system, which are fairly common in most major health organizations and among insurance companies to ensure medical or dental necessity.  *Id.*

Mr. Jester was transferred to Wabash Valley on April 17, 2012, from another prison. Dkt. 121-5, ¶ 3. Mr. Jester has very poor dentition and has lost many of his natural teeth due to decay and facial trauma. Dkt. 121-1, ¶ 8; dkt. 121-4, ¶ 8. Additionally, Mr. Jester has very poor dental hygiene. *Id.* Mr. Jester does not keep his mouth clean, which is evident by examining his mouth. *Id.* Mr. Jester's acid reflux disease is also a factor causing his poor dental condition. Dkt. 147-5 at 31. By the time Dr. Jimerson became Mr. Jester's dentist in June 2012, he had a significant history of tooth decay, and quite a few of his teeth had been extracted or were otherwise missing. Dkt. 121-1, ¶ 9.

On February 27, 2014, Mr. Jester submitted Request for Healthcare Form (RFHC) #186831 requesting a "plate," which is another term used for denture. Dkt. 121-1, ¶ 11; dkt. 121-9 at 10. Dr. Jimerson met with Mr. Jester on March 13, 2014. Dkt. 121-1, ¶ 11. At that time, Mr. Jester was missing nine (9) of his top teeth and six (6) of his bottom teeth. *Id.* On the top, he was missing both posterior and anterior teeth. *Id.* However, on the bottom, he was only missing posterior teeth. *Id.* Under the two-point rule, Mr. Jester qualified for an upper partial denture, but because he had all his anterior teeth on the bottom, he did not qualify for a lower partial denture. *Id.;* Dkt. 121-4, ¶ 9. Dr. Jimerson submitted a PPA form to Dr. Pearcy requesting that Mr. Jester receive an upper

partial denture. *Id*. The next day, on March 14, 2014, Dr. Pearcy approved the upper partial denture for Mr. Jester. *Id*.

On March 20, 2014, Dr. Jimerson obtained a preliminary impression of Mr. Jester's mouth for the upper partial denture and sent it to the lab. Dkt. 121-1, ¶ 12; dkt. 121-9 at 11. On April 22, 2014, Dr. Jimerson made a second impression of the upper part of Mr. Jester's mouth, which is the second step in the process. Dkt. 121-1, ¶ 13; dkt. 121-9 at 11. The lab also sent a wax impression of the bottom part of Mr. Jester's mouth. *Id*.

On May 28, 2014, Mr. Jester submitted HCRF #172234 complaining about a hole in a tooth. Dkt. 121-9 at 12. On June 16, 2014, Dr. Jimerson extracted tooth #5 from Mr. Jester's upper mouth due to decay and a possible abscess forming. Dkt. 121-1, ¶ 14; dkt. 121-9 at 12. Dr. Jimerson (or someone from dental under her instruction) called the lab and had this tooth added to the upper partial denture. *Id*. During this visit, Mr. Jester asked to have all his teeth removed because he wanted a full set of dentures on the top and bottom. *Id*. Dr. Jimerson advised him that it is very important to keep all his natural teeth as long as possible. *Id*.

On July 1, 2014, Dr. Jimerson received the "try-in" denture for Mr. Jester. Dkt. 121-1, ¶ 15; dkt. 121-9 at 12. A "try-in" is where they "try" the mold to determine how it fits and feels to the patient before the final product is made. Dkt. 121-1, ¶ 15. On July 7, 2014, Mr. Jester tried the mold and was satisfied with the fit and color and there were no adjustments needed, so Dr. Jimerson sent the try-in back to the lab to finish the denture. *Id*.

On July 29, 2014, Dr. Jimerson received the finished upper partial denture. *Id.,* ¶ 16. The lab also mistakenly sent a finished lower partial denture. *Id*. On July 30, 2014, Dr. Jimerson provided Mr. Jester with the finished upper denture. *Id*. Dr. Jimerson could not give Mr. Jester the lower partial denture because he had not been approved for it. *Id*. However, Dr. Jimerson submitted

8

a new PPA for a lower partial denture. *Id.*; dkt. 121-4, ¶ 10. Dr. Pearcy approved the request. Dkt. 121-4, ¶ 10.

On August 25, 2014, Dr. Jimerson had to extract another one of Mr. Jester's bottom teeth. Dkt. 121-1, ¶ 16. This was problematic for the lower partial denture because the tooth was the one remaining posterior tooth he had, and it was the tooth that would have anchored the lower partial denture. *Id.* Due to the extraction, Dr. Jimerson had to wait several weeks for the mouth to heal, then take another impression of Mr. Jester's lower mouth and have the missing posterior tooth added to the lower partial denture.  *Id.* On December 8, 2014, Dr. Jimerson delivered the finished lower partial denture to Mr. Jester. *Id.*, ¶ 19.

On January 9, 2015, Mr. Jester broke part of tooth #10. Dkt. 121-1, ¶ 21; dkt. 121-9 at 15. Dr. Jimerson restored the tooth. *Id.*

On September 15, 2015, Mr. Jester submitted RFHC #223421 stating that he had a filling fall out of one of his front teeth. *Id.* On September 30, 2015, Dr. Jimerson evaluated Mr. Jester and determined that tooth #10 should be extracted due to the prior fracture and new signs of infection. Dkt. 121-1, ¶ 21; dkt. 121-9 at 15-16.

On October 30, 2015, Mr. Jester submitted RFHC #227588 stating that he would like a tooth added to his partial denture. Dkt. 121-1, ¶ 22; dkt. 121-9 at 16. On November 3, 2015, Mr. Jester submitted RFHC #200216 complaining about a broken front tooth. Dkt. 121-9 at 16. On November 6, 2015, Dr. Jimerson noted that half the tooth was missing and extracted tooth #25. Dkt. 121-1, ¶ 23; dkt. 121-9 at 16. On November 11, 2015, Mr. Jester submitted a grievance because he wanted all work done on the same day and felt that he should be sent to a specialist to have his dental work completed. Dkt. 121-1, ¶ 24; dkt. 121-9 at 17.

On December 9, 2015, Mr. Jester submitted RFHC #227701 complaining that three teeth

had been causing him pain for 8 days. He wanted the teeth extracted. Dkt. 121-9 at 17. That same day, Dr. Jimerson saw him on an emergency basis and extracted tooth #6.  Dkt. 121-1, ¶ 25; dkt. 121-9 at 17. On January 12, 2016, in RFHC #231254 Mr. Jester complained of a tooth hurting. Dkt. 121-9 at 17. On February 2, 2016, Dr. Jimerson extracted tooth #8. Dkt. 121-1, ¶ 26; dkt. 121-9 at 17. On February 22, 2016, Mr. Jester's RFHC #225852 complained of pain. Dkt. 121-9 at 18. Dr. Jimerson saw him on an emergency basis that day and dispensed pain medication. *Id.* On May 2, 2016, Dr. Jimerson extracted tooth #24.  Dkt. 121-1, ¶ 27; dkt. 121-9 at 17.

On July 18, 2016, Dr. Jimerson performed a full mouth debridement on Mr. Jester and provided him with oral hygiene instructions. Dkt. 121-1, ¶ 28; dkt. 121-9 at 18. Mr. Jester was not cleaning his mouth properly. *Id.* Dr. Jimerson also noted that Mr. Jester had no history of having his teeth cleaned while incarcerated. *Id.* Dr. Jimerson advised him to have regular teeth cleanings in order to preserve his gums and bone. *Id.*

During this appointment, Mr. Jester said that he wanted his dentures "fixed" to have the more recently extracted teeth added to his dentures. *Id.* He complained of having food particles stuck under the partial dentures and believed that getting the missing teeth added to the partial dentures would prevent food from getting under the dentures. *Id.* Dr. Jimerson explained to Mr. Jester that he must remove and clean his dentures after each meal, and that adding teeth to the existing dentures would not prevent food from getting under the denture. *Id.* This type of discomfort caused by food getting in the spaces in the dentures is not unique to Mr. Jester, as it is a common annoyance with all dentures, especially partial dentures. Dkt. 121-4, ¶ 4.

Spaces were left in the partial dentures where additional teeth had been extracted. Dkt. 121-4, ¶ 11. It is the opinion of Dr. Pearcy that despite having these spaces, the dentures were still functional and there was no clinical reason to add prosthetic teeth to the partial dentures.  *Id.*  The

dentures were not damaged in any way. *Id.*

Dr. Jimerson explained to Mr. Jester that he had not had the dentures long enough to receive a new set under IDOC policy. Dkt. 121-1, ¶ 28; dkt. 121-9 at 18. She provided him with a brochure that explains the denture process and notes that a denture is expected to last at least six (6) years unless damaged by dental staff or the shape of the jaw changes and renders the denture useless. *Id.* Dr. Jimerson further explained that because there was no clinical or functional reason to replace the dentures or add teeth to the existing dentures, Mr. Jester could only have the missing teeth added to his dentures if he paid for the prosthetic work himself. *Id.*

On September 8, 2016, Mr. Jester submitted RFHC #255169 requesting to have his dentures sent to the lab to have his missing teeth added to them. Dkt. 121-1, ¶ 29; dkt. 121-9 at 19. On September 15, 2016, Dr. Jimerson met with Mr. Jester and again explained that he would have to pay to add teeth to his existing partial dentures. Dkt. 121-1, ¶ 30; dkt. 121-9 at 19. Dr. Jimerson submitted a PPA to have the teeth added. *Id.* The next day, on September 16, 2016, Dr. Pearcy approved the PPA, at Mr. Jester's expense, as he had had the partial dentures only two years. *Id.* The cost to Mr. Jester would be ninety-three dollars ($93.00) to have the teeth added to the existing dentures. *Id.* Dr. Pearcy noted that "[t]hese additions contradict what DDS recommends, but it will be at the pt's cost." Dkt. 147-5 at 34.

On June 28, 2017, Mr. Jester submitted RFHC #266065 stating that he was having pain with hot and cold. Dkt. 121-9 at 20; dkt. 147-5 at 21. The medical record states that his pain was temporary but was getting worse and it hurt when pressure was applied. *Id.* On July 24, 2017, Dr. Jimerson applied a sedative filling to both teeth #11 and #13. Dkt. 121-1, ¶ 31; dkt. 121-9 at 20; dkt. 147-5 at 21. Sedative fillings are temporary fillings that stabilize a tooth after decay has been removed but also allow time to determine the best treatment for the patient. Dkt. 121-1, ¶ 31. If

the patient responds well to the sedative filling, it is replaced with a permanent filling. *Id*. If the patient does not respond well to the sedative filling, the tooth is extracted. *Id*. Mr. Jester continued to have pain with tooth #13 with the temporary filling so Dr. Jimerson extracted it on August 1, 2017. Dkt. 121-1, ¶ 31; dkt. 121-9 at 20; dkt. 147-5 at 21.

On November 16, 2017, Mr. Jester submitted an informal grievance stating that he was still having problems with his teeth and again asking to have the rest of his teeth pulled and receive full dentures on the top and bottom. Dkt. 147-5 at 35-36. After Dr. Jimerson received notification of the grievance, she consulted Dr. Pearcy and he reiterated the denture policy and confirmed that healthy teeth would not be extracted.  Dkt. 121-1 at ¶ 32; dkt. 121-4, ¶ 14; dkt. 121-9 at 20-21. The grievance was denied on January 16, 2018, stating, "new dentures are not authorized at this time." Dkt. 147-5 at 37. The response on appeal on April 23, 2018, was that "Dental will evaluate for possible dentures" but it is "always the standard of care when permanent teeth are present that they should be left and utilized." *Id.*

Dr. Pearcy states that at no time will a dentist remove restorable or healthy teeth to render a patient eligible for a prosthesis. Dkt. 121-4, ¶ 13. Preservation of natural teeth is extremely important. *Id.* Bone loss occurs in the bone surrounding and supporting extracted (or missing) teeth. *Id*. Replacing the teeth with dentures will not stop bone loss. *Id*. In fact, dentures can exacerbate bone loss in the mouth, which will eventually render the denture useless, as there will be insufficient bone structure to hold the denture in place. *Id*. Moreover, bone loss can adversely affect the patient's facial appearance and overall health. *Id*. For example, dental bone loss can lead to malnutrition from having to eat soft foods, which are generally unable to meet the nutritional requirements of the body, and malnourishment can further lead to constipation, arthritis, indigestion, and rheumatism. *Id*. Additionally, dental bone loss can cause sinus problems and pain.

*Id.* Therefore, removing restorable or healthy teeth would be a breach of the standard of care for dentists.  *Id.* Despite decay or other oral inflammation, a tooth is deemed healthy until disease or inflammation reach the inside of the tooth, the pulp. Dkt. 121-1, ¶ 6.

On February 9, 2018, Mr. Jester submitted RFHC #288212 complaining that the gum would not heal where he had a tooth pulled on September 1, 2017. Dkt. 147-5 at 41. He also said that a temporary filling had come out and the dentist said in August 2017 she would be calling him back. *Id.* Mr. Jester was put on the "scheduling list." *Id.*; dkt. 147-5 at 22; dkt. 121-9 at 21. On April 4, 2018, Mr. Jester submitted another RFHC #292700 complaining of a sharp bone coming through his gum where his tooth was extracted in September 2017. Dkt. 147-5 at 22; dkt. 121-9 at 21. The record stated that Mr. Jester was "[a]lready on waiting list to be seen when dentist is available." *Id.* There is evidence of record that Wabash Valley was without a dentist for a two-month period. Dkt. 147-5 at 46.

On April 9, 2018, Dr. Jimerson surgically removed residual roots from where she had previously extracted tooth #13. Dkt. 121-1, ¶ 33; dkt. 121-9 at 21-22; dkt. 147-5 at 22-23. Retained roots are a known complication of tooth extraction. Dkt. 121-1, ¶ 33. This was the last time Dr. Jimerson treated Mr. Jester. *Id.*

It is Dr. Pearcy's professional opinion, based on his personal knowledge of Mr. Jester's overall dental condition, that Dr. Jimerson's chosen course of treatment for Mr. Jester's dental condition was appropriate, reasonable, and within the community standard of care for dentists. Dkt. 121-4, ¶ 15.

Dennis Meyer, D.D.S., has been the primary dentist at Wabash Valley since April 2018. Dkt. 147-1 at pp 4-6, ¶ 3. On October 8, 2018, Dr. Meyer extracted Mr. Jester's two remaining top teeth. *Id.* at ¶ 4. Mr. Jester developed an infection, and Dr. Meyer provided antibiotics and

13

ibuprofen for pain. *Id.* Dr Meyer has fitted Mr. Jester for a full upper denture. *Id.*

As of April 2019, Mr. Jester had six natural lower teeth. *Id.* at ¶ 5. Mr. Jester's bottom teeth were healthy and perfectly suitable to anchor his partial denture. *Id.* Dr. Meyer is of the opinion that preservation of a natural tooth is always in the best interest of the patient. *Id.* at ¶ 7. Even when a patient reports pain, extraction is a last resort and should be reserved for instances when a natural tooth cannot be restored. *Id.* The standard of care requires that all extractions be justified by clinical indicators, including mobility, redness, swelling, drainage, bone loss, apical radiolucencies, or periodontal pocketing. *Id.* at ¶ 8.

The dental records reflect that on May 8, 2019, Mr. Jester reported for the first time having chronic pain in teeth #21 and #28. Dkt. 147-5 at 27-28. Dr. Meyer took x-rays and asked Mr. Jester about his remaining teeth. Dr. Meyer determined that the new reports of symptoms could be correlated with clinical findings, and Mr. Jester requested that his remaining teeth be extracted. *Id.* Dr. Meyer extracted the teeth on May 16, 2019. *Id.* at 28-29. A complete lower denture was fitted three months later after the gums healed. *Id.* at 29-30.

### 2. Analysis

Mr. Jester was a convicted prisoner at all relevant times. This means that the Eighth Amendment applies to his claims. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017) ("the Eighth Amendment applies to convicted prisoners"). To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendants knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016); *Pittman ex rel. Hamilton v. Cty. of Madison,*

*Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011).

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment,

or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409

(7th Cir. 2014).

The defendants do not dispute that Mr. Jester suffered from objectively serious medical

conditions, so the Court's analysis is limited to whether defendants knew about Mr. Jester's

condition and the substantial risk of harm it posed but disregarded that risk. Mr. Jester argues that

Dr. Jimerson and Dr. Pearcy failed to extract his rotten teeth and order dentures in a timely manner.

It is undisputed that Mr. Jester has had a long history of eroding and decaying teeth. Mr.

Jester has not refuted the defendants' assertions that he has very poor oral hygiene. He does not

dispute the medical records and defendants' affidavits which reflect that he failed to keep his mouth

and teeth clean. Although he argues that his acid reflux caused his tooth decay, the designated

evidence shows that was not the only cause of his extensive dental issues. *See* dkt. 147-5 at 31;

dkt. 121-1, ¶ 8; dkt. 121-4, ¶ 8.  Mr. Jester has not designated evidence from which a reasonable

jury could find otherwise.

Beginning in March of 2014, Mr. Jester requested that all his remaining teeth be pulled and

that he be given full dentures. Because Mr. Jester was missing posterior and anterior teeth on the

top, Dr. Jimerson requested approval for an upper partial denture. Dr. Pearcy approved the request

the next day. Because Mr. Jester was not missing anterior teeth on the bottom, he did not qualify

for a lower partial denture under IDOC policy and the applicable standard of care.

Mr. Jester argues that Dr. Jimerson and Dr. Pearcy failed to timely provide him with full

dentures, but there is no evidence of clinical indications that all his teeth should have been

extracted in March or June of 2014 or in 2017 when Mr. Jester repeated his request. The fact that

Dr. Jimerson in effect denied Mr. Jester's request to have all his teeth pulled and given full dentures does not demonstrate deliberate indifference. The designated evidence shows that extraction is a last resort.  Dkt. 147-1 at ¶ 7.  It was reasonable for and responsible of Dr. Jimerson to comply with IDOC policy and the standard of care by not pulling all of Mr. Jester's teeth just because he wanted them to be pulled.  Moreover, "an inmate is not entitled to demand specific care and is not entitled to the best care possible…." *Arnett,* 658 F.3d at 754. Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm." *Id.*

Mr. Jester further argues that no matter how many times Dr. Jimerson would fill a tooth or repair a filling, the tooth continued to decay, causing him pain and ultimately the tooth was extracted to stop the pain. Mr. Jester argues that his decaying teeth should have been extracted sooner. He disagrees with the course of treatment of filling cavities first with temporary and then permanent fillings or restoring broken teeth. For example, he argues that #8 was decayed and treated multiple times before it was extracted: it had a filling on August 16, 2010; on August 20, 2013, it was restored with resin; on September 20, 2013, that tooth was fractured and restored with resin; and on April 16, 2014, the top part cracked off and Dr. Jimerson again restored it with resin. It was not until February 2, 2016, that Dr. Jimerson finally pulled tooth #8. Contrary to Mr. Jester's argument that this reflected that Dr. Jimerson acted with deliberate indifference to his pain, this example shows that Dr. Jimerson treated Mr. Jester's complaints as they arose and in compliance with the standard of care with extraction as a last resort. There is no evidence that tooth #8 or any other tooth should have been pulled the first time Mr. Jester complained of pain.

Mr. Jester also argues that Dr. Jimerson should have worked on more than one tooth at a time, rather than making him submit additional health care requests. He asserts that Dr. Jimerson considered her time more valuable than his pain. In support of this contention, he notes that he

propounded an interrogatory:  "In response to my grievance, you stated: 'ONE REQUEST, ONE VISIT, ONE TOOTH.' Is this statement an IDOC Policy or one of your own; and if it is an IDOC Policy, state the Policy number and the page of the Policy where that statement can be found?" Dkt. 147-3 at 2.

Dr. Jimerson's response was: "The grievance in question is not attached to the propounded interrogatories; however, Defendant states the following: There is no policy that specifically states, 'one visit, one tooth.' However, in practice patients are seen for one issue per visit." *Id*. When asked the medical reason for "one request, one visit, one tooth," Dr. Jimerson responded: "In any practice, dental or medical, patients are generally seen for one issue per visit in order to keep on schedule." *Id.*

Mr. Jester argues that other dentists worked on multiple teeth at one appointment. This is true but so did Dr. Jimerson. Dkt. 147-5 at 9-10, 21. She also saw Mr. Jester for an emergency appointment on more than one occasion because he was in pain. No reasonable jury could find that Dr. Jimerson sometimes worked on or extracted one tooth at a time because she wanted to cause Mr. Jester more pain. Dr. Jimerson was not deliberately indifferent to Mr. Jester's serious dental needs by sometimes treating one tooth at one appointment.

Mr. Jester next contends that Dr. Jimerson ignored his dental needs, as evidenced by her informing him that he would have to pay the $93.00 before she could have his partial denture redone in September 2016. Although he agreed to pay for the new partial, he was not able to obtain the money. The record reflects, however, that the new partial was not medically necessary. Rather, Dr. Jimerson agreed to submit the request and it was approved, even though there was no clinical or functional reason to replace the dentures or add teeth to the existing dentures at that time. Dr.

Jimerson did not ignore Mr. Jester's dental needs. Rather, she submitted a request on behalf of Mr. Jester even though she knew that it was too soon to obtain a new free partial denture.

The fact that Mr. Jester often disagreed with Dr. Jimerson's clinical opinion does not demonstrate deliberate indifference. "[M]ere disagreement with a doctor's medical judgment is not enough to support an Eighth Amendment violation." *Cesal v. Moats*, 851 F.3d 714, 722 (7th Cir. 2017) (internal quotation omitted). The record reflects that Dr. Jimerson exercised her professional judgment in determining what treatment was appropriate each time she saw Mr. Jester.

Dr. Pearcy did not personally treat Mr. Jester. It is undisputed that as the Regional Dental Director, Dr. Pearcy promptly reviewed the requests for prostheses submitted on Mr. Jester's behalf. Even though Mr. Jester did not have his partial denture for six years, Dr. Pearcy approved a new one if Mr. Jester would pay for it in accordance with IDOC policy. As noted, there is no evidence that a new partial denture was medically necessary at that time.

For the above reasons, no reasonable jury could find that Dr. Jimerson or Dr. Pearcy were deliberately indifferent to Mr. Jester's extensive dental needs. Rather, Dr. Jimerson treated Mr. Jester numerous times in response to his complaints of various dental issues for a period of almost six years. Dr. Pearcy reviewed Dr. Jimerson's requests for prostheses and promptly approved them as clinically indicated. Accordingly, Dr. Jimerson and Dr. Pearcy are entitled to summary judgment in their favor. In addition, any injunctive claim for dentures is now denied as moot.

### C.   Claims Relating to Acid Reflux and Special Diet

Mr. Jester alleges that Regional Medical Directors (RMD) Dr. Michael Mitcheff and Dr. Carl Kuenzli denied Mr. Jester proper medical treatment for his "reflux and regurgitation," causing him pain, suffering, and the deterioration and loss of his teeth. More specifically, the complaint alleges that Dr. Mitcheff denied providers' alleged requests for surgery to treat Mr. Jester's reflux

in 2011 and 2013. Mr. Jester further alleges that Dr. Byrd refused to follow a specialist's orders for a soft, bland diet and Prilosec 40 mg. Finally, he contends that Nurse Hobson was "directly involved with" the defendants in denying Mr. Jester proper treatment for his serious medical needs.

### 1.   Undisputed Facts

Dr. Michael Mitcheff is a physician licensed to practice medicine in Indiana and Michigan. Dkt. 121-6, ¶ 2. He is board-certified in family medicine and has practiced in the field of correctional medicine for more than twenty (20) years. *Id*. From 2007 to 2013, Dr. Mitcheff was the RMD for Corizon. *Id*.  In 2013, Dr. Mitcheff became the Vice President of Clinical Services for Corizon. *Id*. He left Corizon in 2014. *Id*. In 2014, Dr. Mitcheff became the Chief Medical Officer for the IDOC. *Id.* In this role, he was employed by the state of Indiana. *Id*. In 2016, Dr. Mitcheff left the IDOC and worked for a private company called Advanced Correctional Healthcare (ACH) as their Corporate Medical Director. *Id*. In July 2018, Dr. Mitcheff began working for Wexford as the RMD. *Id*.

Dr. Kuenzli is a physician licensed to practice medicine in the state of Indiana. Dkt. 121-7, ¶ 2. Since April 1, 2017, Dr. Kuenzli has been employed as a physician by Wexford. *Id., ¶* 3. Prior to working for Wexford, Dr. Kuenzli worked for Corizon. *Id*. Dr. Kuenzli was employed by Wexford as the RMD from April 1, 2017, until Dr. Mitcheff assumed that role in July 2018. *Id., ¶* 4. As the RMD, Dr. Kuenzli participated in the Utilization Management Review process. *Id., ¶* 5.

Dr. Byrd is a physician licensed to practice medicine in the state of Indiana. Dkt. 121-8, ¶ 2. Dr. Byrd began working at Wabash Valley in December 2014. *Id., ¶* 3. Dr. Byrd is one of Mr. Jester's treating physicians. Dkt. 31-1, ¶ 4. Dr. Byrd was not involved with Mr. Jester's care prior to December 2014. Dkt. 121-8, ¶ 6.

Kimberly Hobson (Nurse Hobson) is a registered nurse licensed in the state of Indiana.

Dkt. 121-5, ¶ 2. Nurse Hobson has been the Healthcare Services Administrator (HSA) at Wabash Valley since 2015. *Id.,* ¶ 5.

Nurse Hobson's role as HSA is administrative. *Id.* She orders medical supplies for the facility, hires medical staff, maintains the nursing staff schedule, responds to offender grievances regarding medical and dental issues, and deals with human resources issues for the medical staff. *Id.* Generally, Nurse Hobson does not perform any nursing duties. *Id.* Although, if the facility is short-staffed, she will fill-in and assist with patient care. *Id.* Nurse Hobson does not—and cannot— supervise or direct any physician, nurse practitioner, physician's assistant, or dentist regarding their treatment of patients, as that would be beyond her scope of duties as the HSA and beyond her scope of knowledge and practice as a registered nurse. *Id.,* ¶ 6.

Providers sometimes ask Nurse Hobson to assist with completing requests for approval of non-formulary medications, therapeutic diets, medical devices, or outside provider consults. *Id.,* ¶ 7. Nurse Hobson's involvement is limited to filling out forms on behalf of the provider and sending them to utilization management. *Id.* The decision to request a non-formulary drug or diet, and the decision to refer a patient for an outside provider consult, is beyond her scope of practice as a nurse—only a provider can do that. *Id.* Nurse Hobson did not—and cannot—prescribe or deny Mr. Jester a medical diet; prescribe or deny Prilosec, or any other medication, or refer or deny a referral to a specialist for a consultation. *Id.,* ¶¶ 12-15. Only a provider can do those things. *Id.*

Nurse Hobson has responded to several of Mr. Jester's grievances related to his medical diet, medications, and dental care. *Id.,* ¶ 9. When she receives a grievance from the facility grievance specialist, she typically contacts the staff member who is the subject of the grievance and discusses the allegations. *Id.* She reports her findings to the grievance specialist who manages the grievance. *Id.* This is the extent of Nurse Hobson's involvement in the grievance process. *Id.*

She does not make any decisions regarding the status of a grievance, as that is not in her purview as the HSA. *Id.*

Nurse Hobson has met with Mr. Jester on at least one occasion to discuss his medical diet. *Id.*, ¶ 10. In that instance, she explained what had been relayed to her by the provider and Aramark, the food services provider at the facility. *Id.*

Mr. Jester has a long history of gastroesophageal reflux disease ("GERD" or acid reflux). Dkt. 31-1, ¶ 6. GERD occurs when acid from the stomach backs up into the esophagus (*i.e.*, the tube that carries food from the mouth to the stomach). *Id.* The primary symptom of GERD is heartburn. *Id.* Frequent burping, coughing, nausea, and vomiting are associated symptoms of acid reflux. *Id.* There are many foods and drinks that can trigger heartburn, especially if they contain caffeine (*e.g.*, coffee, tea, and chocolate). *Id.* Spicy, greasy, salty, and acidic foods and drinks can also trigger heartburn. *Id.* People who have acid reflux should avoid lying flat because the stomach and throat are at the same level, which makes it easier for stomach acid to travel up the esophagus and into the throat. *Id.*

Over the years, several physicians at the prison, including Dr. Byrd, have periodically provided Mr. Jester with a soft diet in an effort to relieve his GERD symptoms. Dkt. 31-1, ¶ 7. A soft diet consists of foods that are easy to digest and lacking in spices. *Id.* Mr. Jester is obese and has been counseled to lose weight and stop eating foods from commissary that irritate his GERD such as potato chips, saltine crackers, Ramen noodles, pastries, chocolate, summer sausage, and carbonated beverages. Dkt. 31-1, ¶ 7; dkt. 121-6, ¶ 13; dkt. 121-11 at 32; dkt. 121-12 at 59; dkt. 147-6 at 42, 47.

In addition to avoiding trigger foods, medications that reduce acid in the stomach are also effective at reducing heartburn and other symptoms of GERD. Dkt. 31-1, ¶ 8. These medications

include proton pump inhibitors (PPIs), such as Prilosec. *Id*. In May 2015, Dr. Martin, Mr. Jester's treating physician at the prison, increased Mr. Jester's Prilosec from 20 mg twice per day to 40 mg twice per day because Mr. Jester reported that his GERD symptoms were getting worse. *Id.,* ¶ 10. Despite the increase in Prilosec, Mr. Jester continued to complain of worsening GERD symptoms. *Id*. As a result, Dr. Martin referred Mr. Jester to Terre Haute Regional Hospital for a consultation with a gastroenterologist to evaluate the severity of his GERD. *Id*.

On August 12, 2015, Dr. Francis Tapia, a surgeon at Terre Haute Regional Hospital, performed an esophagogastroduodenoscopy (EGD), which established multiple erosions and ulcerations at the distal esophagus. Dkt. 31-1, ¶ 11; dkt. 121-11 at 35-36; dkt. 121-12 at 59; dkt. 147-6 at 44. Dr. Tapia ordered a post-operative mechanical soft diet and continued Mr. Jester on 40 mg of Prilosec twice per day. Dkt. 31-1, ¶ 11; dkt. 121-12 at 183; dkt. 147-6 at 44.  When Mr. Jester returned to the prison, he was continued on Prilosec and the mechanical soft diet, as recommended by Dr. Tapia. *Id.*

On November 24, 2015, Dr. Tapia performed a Nissen Fundoplication on Mr. Jester. Dkt. 31-1, ¶ 12; dkt. 121-11 at 24-33; dkt. 147-6 at 49. A Nissen Fundoplication is a surgical procedure where a portion of the stomach is wrapped around the lower esophageal sphincter to prevent stomach acid from backing up into the esophagus. Dkt. 31-1, ¶ 9.

On December 30, 2015, Dr. Byrd evaluated Mr. Jester in the Chronic Care Clinic. *Id.,* ¶ 13. Mr. Jester reported great improvement with his GERD symptoms since having the Nissen Fundoplication. *Id*. As a result, Dr. Byrd decreased Mr. Jester's Prilosec from 40 mg twice per day to 20 mg twice per day with the goal of weaning him off his reflux medication altogether. *Id*.

On February 3, 2016, Dr. Tapia performed a post-operative evaluation on Mr. Jester.  *Id.,* ¶ 14; dkt. 121-11 at 18. Dr. Tapia recommended "follow-up PRN, regular diet, and PPI as needed."

22

*Id.* Dr. Tapia did not recommend any particular PPI nor did he recommend a dose at that time. Dkt. 121-7, ¶ 14. Dr. Tapia never recommended that Mr. Jester be on Prilosec or any other PPI for life. *Id.* Mr. Jester remained on Prilosec 20 mg twice per day for more than a year thereafter. Dkt. 31-1, ¶ 16.

An order written by Dr. Byrd dated May 2, 2016, stated that "[o]ffender has ongoing issues related to reflex esophagitis." Dkt. 147-6 at 52. "Dietary changes to mechanical soft, bland diet with no processed meats previously approved, however, patient needing low fat milk to be added to his diet as regular milk problematic." *Id.* "Following diet change requested. Mechanical soft, bland diet with no processed meats and low fat milk (only change is low fat milk.)." *Id.*

In Dr. Kuenzli's affidavit, he states that regular milk and processed meats were eliminated from Mr. Jester's diet in an effort to reduce his symptoms of GERD because a low-fat diet may improve those issues. Dkt. 121-7, ¶ 8.

About a year later, on June 21, 2017, Dr. Byrd evaluated Mr. Jester in the Chronic Care Clinic. Dkt. 31-1, ¶ 17. Mr. Jester reported that he continued to have random heartburn related to what he was eating and that he had relief with Prilosec. *Id.* Because Mr. Jester's heartburn was only occurring on a random basis after eating, Dr. Byrd wanted to wean him off Prilosec, which is recommended for chronic heartburn, and start him on Pepcid, a drug similar to Zantac, that Mr. Jester could take for his random episodes of heartburn. *Id.* Dr. Byrd also encouraged Mr. Jester to avoid eating spicy foods like Ramen noodles, meat logs, nachos, and BBQ foods, which were on his commissary purchase history. *Id.* Dr. Byrd also stressed the importance of weight loss because the extra weight pushes on the stomach and causes backflow of stomach acid. *Id.*

Dr. Byrd states that less than a month later, on July 12, 2017, after several years of Mr. Jester's eating trigger foods from commissary and refusing to lose weight, the mechanical soft diet

with no processed meat and low-fat milk and the Prilosec were stopped. Dkt. 31-1, ¶ 18. It is the opinion of Dr. Byrd and Dr. Kuenzli that there was no clinical reason for Mr. Jester to be on a mechanical diet at that time, and the last recommendation from Dr. Tapia was for a regular diet. Dkt. 31-1, ¶ 20, dkt. 121-7, ¶ 15; dkt. 121-11 at 18.

Mr. Jester filed a grievance about the discontinuance of the Prilosec and the special diet. Dkt. 147-6 at 59-60. On October 31, 2017, Dr. Byrd evaluated Mr. Jester in the Chronic Care Clinic. Dkt. 31-1, ¶ 19. After being off Prilosec for a few weeks, Mr. Jester reported that he had started to have severe GERD symptoms. *Id.* Dr. Byrd reordered Prilosec 20 mg twice a day. *Id.* The grievance on the special diet was denied because Dr. Tapia, the specialist, had recommended a regular diet. Dkt. 147-6 at 60.

On April 4, 2018, another prison physician, Dr. Denning, evaluated Mr. Jester for complaints of difficulty swallowing and vomiting after meals. Dkt. 31-1, ¶ 20. As a result of these complaints, Dr. Denning put Mr. Jester on a no citrus, no legume, no tomato diet, which eliminated trigger foods from his food services diet. *Id.*

On May 4, 2018, Mr. Jester filed a grievance asking to be put back on the bland soft diet with low-fat milk and no processed meats. Dkt. 147-6 at 66. In his grievance, Mr. Jester stated that for 20 months he was on a bland diet with low-fat milk and no processed meats, during which time he never vomited. *Id.* He further reported that since being on the new no citrus, legumes, or tomato diet, he threw up all the time. *Id.* He stated, "It was working so why chage [sic] it at all." *Id.* For relief, he asked to be put back on the bland soft diet with low-fat milk and no processed meats. *Id.*

A special diet request to the RMD dated May 7, 2018, stated that Mr. Jester had been on a regular diet and he reported he was compliant with lifestyle modifications but was having difficulty swallowing and vomiting. Dkt. 147-6 at 69. Mr. Jester had been approved for a no citrus, legumes,

and tomato diet but Mr. Jester continued to complain of difficulty swallowing and vomiting. *Id.* Dr. Byrd requested approval from the RMD for a no citrus, legumes, tomato diet *with* low-fat milk and no processed meats. *Id.* The request was submitted by Nurse Hobson. *Id.* At that time, Dr. Kuenzli was the RMD. Dkt. 147-6 at 70.

In another grievance filed by Mr. Jester on May 7, 2018, he reported that it was the processed meats that were causing him problems. Dkt. 147-6 at 71. He also said that the beverage drink he was given had acid in it and he could not keep it down. *Id.* The same thing happened when he drank the protein powder drink he was given. *Id.* He again asserted that he had gone for months after surgery without vomiting and then his diet was not renewed and eight months later he was put on the no citrus, legumes, tomato diet that caused him to vomit every time he ate. *Id.* He repeated that he had had no problems when he was on the soft bland diet with low-fat milk and no processed meats. *Id.* He asked to be put back on it. *Id.* The response to the grievance was that "K. Hobson has discussed your diet with you. The 'bland' diet you request is not available. You are approved for an equivalent diet." *Id.* The grievance was denied on June 7, 2018. *Id.*

A medical record signed by Dr. Byrd on July 2, 2018, acknowledges that Mr. Jester reported no issues with the mechanical soft bland diet with low-fat milk and no processed meats. Dkt. 147-6 at 72. Mr. Jester was educated on the list of foods to avoid and foods to refrain from purchasing on commissary. *Id.* The record states that Mr. Jester said he was compliant with lifestyle modifications. *Id.* Further, Mr. Jester "has now been on regular diet and reports difficulty swallowing and vomiting." *Id.* "Pt. approved for no citrus, legumes, and tomato diet but continues to complain of difficulty swallowing and vomiting." *Id.* Dr. Byrd then requested the no citrus, legumes, tomato diet. *Id.*

Dr. Byrd prescribed the no citrus, legumes, tomato diet again on January 9, 2019, and again

25

on March 26, 2019, through July 26, 2019. Dkt. 147-6 at 73-74.  During the same time period, Dr. Rajoli prescribed on April 19, 2019, for a three-month period, a mechanical soft, bland diet with low-fat milk and no processed meats. *Id*. at 75-77. Mr. Jester submitted an informal grievance on May 3, 2019, asking for the mechanical soft diet that had been ordered by Dr. Rajoli because Mr. Bedwell of Aramark had stopped the diet. *Id*. at 80.  The response dated May 15, 2019, was that "Diet was approved by Regional M.D. Mechanical soft bland, low-fat milk no processed meat." *Id.*  Internal emails in June 2019 reveal that there were conflicting diet orders issued by different physicians. *Id.* at 81. On June 26, 2019, Dr. Byrd ordered a regular diet with an "indefinite" end date. *Id* at 83.

On July 12, 2019, Dr. Byrd admitted Mr. Jester to the infirmary to confirm Mr. Jester's complaints of vomiting with the regular diet. Dkt. 147-6 at 85-88. Mr. Jester ate all the food on the tray instead of avoiding foods he knew would trigger his symptoms. *Id.* at 88. Nursing staff witnessed the persistent vomiting with the current regular diet order. *Id.*

On July 18, 2019, Dr. Byrd again ordered a no citrus, no legumes, tomato free diet. Dkt. 147-6 at 91.

On July 26, 2019, the Court granted Mr. Jester's request for emergency medical injunctive relief and ordered the defendants to either provide Mr. Jester the diet ordered by Dr. Rajoli consisting of a mechanical soft bland diet, low-fat milk, and no processed meats, or promptly arrange to send Mr. Jester to an independent gastroenterologist to obtain an opinion on whether that diet would improve Mr. Jester's symptoms of vomiting after each meal. Dkt. 98. Defendants chose not to have Mr. Jester seen again by the specialist and instead ordered the mechanical soft, bland diet with low-fat milk and no processed meats. Dkt. 99. On July 29, 2019, Dr. Byrd ordered the mechanical soft, bland, low-fat milk, no processed meat diet. Dkt. 147-6 at 94.

It is Dr. Mitcheff's professional opinion as a physician that Dr. Kuenzli and Dr. Byrd did not breach the standard of care in discontinuing the mechanical, soft bland diet with low-fat milk and no processed meat. Dkt. 121-6, ¶ 18. It is his opinion that there is no clinical indication for this diet. *Id*. A bland diet with no acidic foods may be appropriate for a patient with acid reflux, which has been provided to Mr. Jester in the past. *Id*. However, in his opinion there is no clinical reason for Mr. Jester to receive a special diet with no processed meats and low-fat milk. *Id*. Meat that has been smoked, salted, cured, dried or canned is considered processed. *Id*. Sausage, hot dogs, salami, ham and cured bacon are considered processed meats. *Id*. In over 30 years of medical practice, Dr. Mitcheff has never seen a therapeutic diet that specifically restricts processed meat. *Id*. He believes there is no medical reason to do so. *Id*. The same is true for low-fat milk. *Id*.

### 2.. Analysis

### a.    One Claim Against Dr. Mitcheff is Barred by Statute of Limitations

As noted, the complaint alleges that Dr. Mitcheff denied providers' alleged requests for surgery to treat Mr. Jester's reflux in 2011 and 2013. Dr. Mitcheff argues that this claim against him is barred by the statute of limitations.

"Suits under § 1983 use the statute of limitations and tolling rules that states employ for personal-injury claims." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). In Indiana, the applicable statute of limitations period is two years. Ind. Code § 34–11–2–4(a). This action was filed on March 16, 2018. Mr. Jester has not presented any basis on which to find that this claim against Dr. Mitcheff was timely filed. Rather, he agrees that "the treatment Jester received prior to the two (2) year limitations IS NOT PART of his claims in this case…." Dkt. 162 at 8. Accordingly, this claim is untimely and summary judgment as to this claim is **granted in favor of Dr. Mitcheff.**

b.      **Claim Against Nurse Hobson**

"Individual liability under § 1983… requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chi.,* 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An *individual* cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.... A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.")).

Mr. Jester's claim against Nurse Hobson is based on the response to his May 7, 2018, grievance complaining that processed meats and the drinks he was being given were causing him to vomit. Dkt. at 147-6 at 71. The response was not written by Nurse Hobson, but it stated, "K. Hobson has discussed your diet with you. The 'bland' diet you request is not available. You are approved for an equivalent diet." *Id.* Mr. Jester argues that Nurse Hobson was wrong in saying the diet he wanted was not available and the diet he was receiving was equivalent, but it is evident that Nurse Hobson did not write the response. To the extent that Mr. Jester argues that what Nurse Hobson might have told him was incorrect, he does not allege and there is no evidence showing that Nurse Hobson did anything more than convey information from other staff to Mr. Jester. The evidence is undisputed that Nurse Hobson did not have the authority to prescribe or discontinue any special diet. Even if Nurse Hobson had been negligent, which has not been shown, that would not be sufficient to support a deliberate indifference claim. *Walker,* 940 F.3d at 964 ("[E]vidence of medical negligence is not enough to prove deliberate indifference….") (internal quotation omitted).

Accordingly, there is no evidence that Nurse Hobson acted with deliberate indifference to

28

Mr. Jester's serious medical needs. The motion for summary judgment is **granted in favor of** Nurse Hobson.

      **c.**      **Remaining Claim Against Dr. Mitcheff and Claims Against Dr. Kuenzli and Dr. Byrd**

Mr. Jester alleges that Dr. Mitcheff and Dr. Kuenzli denied proper treatment for his reflux. He also alleges that Dr. Byrd refused to follow a specialist's orders for a soft, bland diet and Prilosec 40 mg.

In November 2015, specialist Dr. Tapia performed a surgical procedure which helped improve Mr. Jester's long-term GERD symptoms. On February 3, 2016, Dr. Tapia recommended that Mr. Jester follow up with him as needed and be given a regular diet and PPI as needed. Mr. Jester has not seen the specialist since that time. No reasonable jury could find that Dr. Byrd refused to follow a specialist's orders for a soft bland diet and Prilosec 40 mg. because this is not what Dr. Tapia most recently ordered. In fact, in response to the motion for summary judgment, Mr. Jester now argues that the medical defendants were deliberately indifferent for relying on the specialist's 2016 order for a regular diet. **Dr. Byrd is entitled to summary judgment on this specific claim**.

Aside, however, from Dr. Tapia's order of a regular diet, Mr. Jester's claim is construed more broadly that Dr. Byrd refused to provide him with the bland soft diet and Prilosec. The Court now turns to Mr. Jester's claim that the medical physicians denied proper treatment for his reflux and regurgitation.

On May 2, 2016, Dr. Byrd prescribed a mechanical soft bland diet with no processed meats and added a further restriction of low-fat milk because regular milk was "problematic." Dr. Kuenzli acknowledges that regular milk and processed foods were removed from Mr. Jester's diet because a low-fat diet may improve GERD symptoms. More than a year later, in June 2017, Mr. Jester told

Dr. Byrd that he was having some heartburn on a random basis after he ate.  The next month, the mechanical soft diet with no processed meat and low-fat milk and Prilosec were discontinued. The reason given for this change in treatment was because Mr. Jester ate trigger foods from commissary and refused to lose weight. After a few weeks of being off the Prilosec, Mr. Jester's symptoms were severe again. In October 2017, Dr. Byrd restarted the Prilosec but denied the diet based on the order written by Dr. Tapia for a regular diet more than a year and a half earlier.

In April 2018, another physician responded to Mr. Jester's complaints of difficulty swallowing and vomiting by prescribing a no citrus, legume, and tomato diet. The next month, Mr. Jester filed two grievances asking that he be put back on the previous diet because he was vomiting all the time on the no citrus diet and he had never vomited while on the soft bland diet with low-fat milk and no processed meats. Dr. Byrd put in a request to the RMD—Dr. Kuenzli at the time—for the additions of no processed meats and low-fat milk. Mr. Jester's grievances were denied, and he was told the bland diet he requested was "not available." Dkt. 147-6 at 71. And a July 2018 medical form lists a no citrus, legume, or tomato diet, without including no processed meats or low-fat milk.  *Id.* at 72.  It's therefore reasonable to infer that Dr. Kuenzli denied the request to add no processed meats and low-fat milk to Mr. Jester's diet.

In July 2018, Dr. Byrd acknowledged that Mr. Jester was not doing well on the no citrus, legumes, and tomato diet. Mr. Jester reported difficulty swallowing and vomiting but Dr. Byrd still prescribed the no citrus diet at that time and continued to prescribe it through June 2019. Dr. Rajoli ordered the mechanical soft diet on April 19, 2019, but Dr. Byrd prescribed a regular diet on June 26, 2019. Dr. Mitcheff was the RMD at this time, and approved the mechanical soft diet that Mr. Jester requested.  Dkt. 147-6 at 80.  There is no designated evidence that Dr. Mitcheff knew that

conflicting diets had been ordered for Mr. Jester.  *See* dkt. 147-6 at 81. Mr. Jester continued to ask for the soft bland diet with low-fat milk and no processed meats.

On July 12, 2019, Dr. Byrd admitted Mr. Jester to the infirmary to confirm whether he really did vomit on the regular diet. Nursing staff confirmed that Mr. Jester persistently vomited after he ate the regular diet. Nonetheless, a week later, Dr. Byrd ordered a no citrus, legumes, tomato diet, a diet that Mr. Jester had told Dr. Byrd over the past year caused him to have difficulty swallowing and to vomit. This was the time frame during which the Court granted Mr. Jester's motion for emergency medical injunctive relief and ordered the defendants to either prescribe the mechanical soft diet with low-fat milk and no processed meats or send Mr. Jester to a specialist to obtain an opinion on whether that diet would improve Mr. Jester's symptoms. On July 29, 2019, in compliance with the Court's order, Dr. Byrd ordered the mechanical soft diet. Mr. Jester was not sent to the specialist.

In support of their motion for summary judgment, the defendants argue that "an inmate is not entitled to demand specific care." Dkt. 159 at 18. That is true, and "medical professionals may choose from a range of acceptable courses based on prevailing standards in the field." *Walker*, 940 F.3d at 965. Mr. Jester responds that persisting in ineffective treatment demonstrates deliberate indifference. All these principles are correct, but whether "acceptable courses" of treatment were chosen in this case is the dispositive question.

The Seventh Circuit has held that one clear demonstration of deliberate indifference is "where a prison official persists in a course of treatment known to be ineffective." *Petties*, 836 F.3d at 729–30; *see also Arnett*, 658 F.3d at 754 ("A prison physician cannot simply continue with a course of treatment that he knows is ineffective in treating the inmate's condition."); *Greeno v. Daley,* 414 F.3d 645, 655 (7th Cir. 2005) (continuing to treat severe vomiting with antacids and

refusing to refer inmate to a specialist over three years created material fact issue of deliberate indifference). In this case, the designated evidence shows that the medical physician defendants did not prescribe and approve a particular special diet for Mr. Jester when they knew that other diets were causing consistent GERD symptoms, including difficulty swallowing and regurgitation.

Mr. Jester persistently told medical staff that when he was given the mechanical soft diet with low-fat milk and no processed meats for months at a time, his symptoms were essentially eliminated. Dr. Byrd states in his 2018 affidavit that that diet was stopped because Mr. Jester was ordering trigger foods off commissary and he refused to lose weight. Dkt. 31-1, ¶ 18. In that same affidavit, Dr. Byrd states that "the mechanical diet appeared to be ineffective, as Mr. Jester continued to complain of GERD symptoms while on the diet." *Id.* Clearly, Mr. Jester disagrees with that assertion. Dr. Byrd continued, "Moreover, there was never a clinical reason for Mr. Jester to be on a mechanical diet, and the last recommendation from Dr. Tapia was for a regular diet." *Id*.

But there is conflicting designated evidence.  First, there were numerous prescriptions for the soft diet.  Second, Dr. Kuenzli stated that regular milk and processed foods were removed from Mr. Jester's diet to try to reduce his symptoms of GERD. Moreover, Mr. Jester argues that relying on a "regular diet" recommendation from February 2016 without allowing him to see the specialist again while he continued to complain of GERD symptoms constitutes deliberate indifference.

 Mr. Jester consistently reported that the regular diet caused him to vomit, as did the no citrus, legumes, or tomato diet. In July 2019, Dr. Byrd isolated him in medical to observe him vomit after each meal on the regular diet. Dkt. 147-6 at 88. Dr. Mitcheff stated that "[i]n over 30 years of medical practice, I have never seen a therapeutic diet that specifically restricts processed meat. There's no medical reason to do so. The same is true for low-fat milk." Dkt. 121-6, ¶ 18. But

this statement conflicts with the statement of Dr. Kuenzli that low-fat milk and no processed meats were added to the diet because a low-fat diet might improve Mr. Jester's symptoms. Dkt. 121-7, ¶ 8.

Dr. Mitcheff further asserts that, "Mr. Jester has a history [of] non-compliance with his various therapeutic diets by regularly consuming foods and beverages that should be avoided by someone with acid reflux, such as summer sausage (processed meat), chocolate, coffee, carbonated beverages, salty high-fat foods and other sweets. Mr. Jester does not deny consuming these foods." Dkt. 121-6, ¶ 18. Mr. Jester responds that although the defendants contend that he orders chocolate, peanut butter, and ramen noodles from commissary and that they are trigger foods, he eats the noodles plain, without the seasoning packet. Dkt. 162 at 16. He also contends that peanut butter and chocolate do not aggravate his reflux. *Id.* He urges that *he* knows best what foods trigger *his* acid reflux. He has lived with it for many years.

There is no designated evidence showing that any specific foods Mr. Jester ordered from the commissary actually triggered his acid reflux and vomiting. Regardless, even if Mr. Jester did order some foods that sometimes caused an adverse reaction, that would not justify keeping him on a diet that he has demonstrated causes him to vomit.

The Seventh Circuit has held that "categorical" rules of treatment that deprive inmates of necessary treatment are not constitutional. "[D]eliberate indifference claims based on medical treatment require reference to the *particularized circumstances* of individual inmates." *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011). "[I]t is implicit in the professional judgment standard itself, …, that inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments." *Id.*

In this case, Mr. Jester has been asking for a special diet (that has been prescribed in the past) because that was an effective treatment for him while other diets are not. Although "an inmate is not entitled to demand specific care and is not entitled to the best care possible, he is entitled to reasonable measures to meet a substantial risk of serious harm." *Arnett,* 658 F.3d at 754. "[T]he Eighth Amendment safeguards the prisoner against a lack of medical care that may result in pain and suffering which no one suggests would serve any penological purpose." *Petties*, 836 F.3d at 727 (internal quotation omitted).

A reasonable jury could find that prescribing and approving diets (regular diet or a no citrus, legumes, tomato diet) known to aggravate Mr. Jester's symptoms was not an acceptable or reasonable course of treatment. *See Walker*, 940 F.3d at 965; *Petties*, 836 F.3d at 729–30; *Arnett*, 658 F.3d at 754; *Greeno,* 414 F.3d at 655. A reasonable jury could find that it was not reasonable for the medical defendants to refuse to provide Mr. Jester a soft bland diet with low-fat milk and no processed meats.

A reasonable jury could further find that defendants Dr. Kuenzli and Dr. Byrd were deliberately indifferent to Mr. Jester's acid reflux because of their personal involvement in denying him the diet that he requested to alleviate his acid reflux.  Or a jury could find that they were not.  But making the determination requires factual findings and credibility determinations, tasks that are for a jury.  Therefore, as to this claim, the motion for summary judgment is **denied** as to Dr. Kuenzli and Dr. Byrd.  However, the motion for summary judgment is **granted** as to Dr. Mitcheff, who approved the precise diet Mr. Jester requested.  Dlt. 147-6 at 80.  While Mr. Jester was under conflicting diet orders while Dr. Mitcheff was RMD, there is no designated evidence that Dr. Mitcheff was personally responsible for that, and § 1983 liability requires personal involvement. *Colbert,* 851 F.3d at 657.

**IV. Conclusion**

For the reasons discussed above, the motion for summary judgment, dkt. [119] is **granted** as to the claims brought against defendants Dr. Jimerson, Dr. Pearcy, and Kimberly Hobson. Any claim that Dr. Mitcheff denied surgery for Mr. Jester in 2011 and 2013 is **dismissed as untimely.** The motion for summary judgment, dkt. [119], is **denied** as to the reflux and special diet claims brought against Dr. Kuenzli, and Dr. Byrd and **granted** as to Dr. Mitcheff. No partial final judgment will issue at this time.

Mr. Jester's motion for non-party civil contempt and enforcement of Court ordered medical injunction, dkt. [163] is **denied without prejudice** subject to the further proceedings in this action, although the Entry of July 26, 2019, granting Mr. Jester's motion for emergency medical injunction, dkt. 98, **remains in effect.**

The reflux and special diet claims will be resolved by settlement or trial. The Magistrate Judge is requested to set this matter for a status conference and a settlement conference in an effort to resolve the remaining claims against Dr. Kuenzli and Dr. Byrd.

**SO ORDERED.**

Date: 10/7/2020

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

RICKY JESTER
983966
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

All electronically registered counsel

Magistrate Judge Mark J. Dinsmore